(No. 51714.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant,
v. JOHN MILLER, Appellee.

*Opinion filed March 21, 1980.—Rehearing denied May 29, 1980.*

William J. Scott, Attorney General, of Springfield, and Bernard Carey, State's Attorney, of Chicago (Donald B. Mackey and Melbourne A. Noel, Jr., Assistant Attorneys General, of Chicago, and Marcia B. Orr, Myra J. Brown, and Terrence P. Gillespie, Assistant State's Attorneys, of counsel), for the People.

James J. Doherty, Public Defender, of Chicago (Donald S. Honchell and John Thomas Moran, Assistant Public Defenders, of counsel), for appellee.

MR. JUSTICE KLUCZYNSKI delivered the opinion of the court:

Defendant, John Miller, was tried in the circuit court of Cook County in October 1976 on charges of attempted murder and armed robbery. He was acquitted of attempted murder, and a mistrial was declared as to the charge of armed robbery. On retrial of the armed robbery charge, a jury found defendant guilty, and the court sentenced him to a term of imprisonment of four to eight years. In his appeal to the appellate court, defendant argued that evidence of guilt was insufficient; that the circuit court erred in refusing to grant a new trial after having heard the confession of a defense witness, Alfred Myles, which exculpated defendant; and that defendant received ineffective assistance of counsel by virtue of the circuit court's appointment of an assistant public defender to advise Myles, the defense witness, of his rights when asked potentially incriminating statements by defendant's attorney, also an assistant public defender. The appellate court addressed only the last argument and agreed with defendant that he received ineffective assistance of counsel, reversing the judgment of conviction and remanding the cause to the circuit court for a new trial. (67 Ill. App. 3d 415.) We allowed the State's petition for leave to appeal.

Lloyd Dixie testified for the State that he was robbed by three individuals in the early morning of March 5, 1976. According to Dixie, he was approached by two men and a woman at approximately 2:40 a.m. as he walked along the 7300 block on South Phillips in Chicago. The three announced a stickup, knocked Dixie to the ground, and took Dixie's wallet, $80 and a ring. At trial, Dixie stated that one of the three assailants had a gun, identify-

ing defendant, seated in the courtroom, as that person. Dixie also stated that he heard three shots as the assailants fled.

Following the robbery, Dixie found Chicago police officers Lemont Thompson and Gerald Boone in a patrol car at a nearby intersection. While Dixie was relating the details of the incident to the officers, Dwayne Chapman approached the car and indicated that he had witnessed the robbery. Chapman gave an account of the robbery which was substantially similar to that of Dixie. Chapman also told the officers, and later testified at trial, that the three assailants entered an apartment building at 7350 South Phillips after robbing Dixie and firing three shots at Dixie while fleeing. He also said that he recognized two of the three assailants as residents of apartment 304 in that building.

Officer Thompson also testified on behalf of the State, relating first how he and fellow officer Boone were approached by Dixie and Chapman. Upon being told by Chapman that two of the three assailants lived in apartment 304 at 7350 South Phillips, Thompson proceeded to the building with Boone, Dixie and Chapman. Other officers were summoned and arrived shortly thereafter. Although he heard movement inside, Thompson testified that he was denied admittance for 5 to 10 minutes, at which time the door was opened by a woman who identified herself as Barbara Meyers. Defendant and two other men were found in beds in a rear bedroom. Thompson testified that one of Dixie's identification cards was found on the ledge of the bedroom window and that more of Dixie's belongings were found on the ground below the window. The officers also recovered $66 from under the mattress on which defendant was lying.

Following the State's case in chief, defendant's attorney, an assistant public defender, indicated that he would call Alfred Myles to the stand. Myles had been recently

charged with the robbery of Dixie, and the attorney said that Myles, if called by defendant, would admit his participation in the robbery. Being so informed, the court appointed another assistant public defender to advise Myles of his rights. At the time of trial, Myles was also under indictment for murder and was being represented by the public defender's office in that case. He had also been represented by the public defender in an earlier case which resulted in conviction. The charge involved in that case is not entirely clear from the record, although Myles later testified in post-trial proceedings that his only prior conviction was for robbery.

The assistant public defender assigned to advise Myles objected to his appointment, requesting the court to appoint counsel other than someone from the public defender's office and to allow the office to withdraw as counsel in Myles' pending murder prosecution. The court denied the request, telling the assistant public defender that he found no conflict and "that you as an attorney know what his rights are and that you can properly advise him as to his rights ***."

After consulting with the assistant assigned to him, Myles refused to testify. Defense counsel requested that Myles take the stand, and the court so ordered. When asked about his knowledge of, and participation in, the robbery, Myles invoked the privilege against self-incrimination.

Barbara Meyers and Ray Horton were also called by the defense, and both testified that they were with defendant in apartment 304 from 9 p.m. on the night of the robbery until the police arrived. Meyers further testified that her brothers, Alfred and Eddie Myles, entered the apartment with Felicia Allen at approximately 2 a.m., and both Meyers and Horton testified that Alfred fled through a rear window before the police arrived.

On cross-examination, Meyers stated that defendant

was like a brother to her and that she did not want him to go to jail. She also stated that she had not previously told anyone that Alfred had gone out the window and admitted that she had not mentioned this at defendant's original trial. She also admitted that she had fallen asleep at approximately 10:30 or 10:45 p.m. and did not awake until 3 a.m., except to feed her baby shortly after 2 a.m. Finally, she testified that the $66 found under a mattress in the rear bedroom was hers and was placed there by her.

Eddie Myles also testified on behalf of defendant, stating that he had pleaded guilty to the robbery of Dixie and that he, his brother Alfred and Felicia Allen were the three who committed the robbery. Defendant, he said, was asleep in apartment 304.

On cross-examination, Eddie Myles admitted that he had testified at defendant's original trial that "an unknown man" was the other male participating in the robbery and that this "unknown man" was the one with the gun. He explained that the "unknown man" to whom he had referred was actually his brother, Alfred, and that his prior testimony was in error.

Finally, defendant himself took the stand and denied participating in the robbery. He testified that he was asleep in apartment 304 at the time and that the Myles brothers entered the bedroom minutes before the police arrived.

Following its deliberations, the jury returned a verdict of guilty, and the court entered judgment thereon. At the sentencing hearing, defendant moved for arrest of judgment and a new trial, offering in support thereof the testimony of Alfred Myles. Myles was again represented by an assistant public defender and was advised of his rights. This time, however, Myles decided to testify, stating that he, his brother and Felicia Allen committed the robbery and that defendant was not involved. When asked about the gun that was used in the robbery, Myles expressed his understanding that no gun was involved. The court denied

the motions for arrest of judgment and new trial and sentenced defendant to a term of imprisonment of four to eight years.

The appellate court reversed and remanded for a new trial on the basis of its finding that defendant's attorney, an assistant public defender, was laboring under a conflict of interest created by the appointment of another assistant public defender to advise the defense witness, Alfred Myles. The appellate court was without the benefit of our recent pronouncements on the subject of conflicts of interest in public defenders' offices (*People v. Walton* (1979), 78 Ill. 2d 197; *People v. Spicer* (1979), 79 Ill. 2d 173; *People v. Robinson* (1979), 79 Ill. 2d 147), and in applying these cases to the facts now before us, we conclude that the appellate court erred in holding that a conflict of interest is here present.

In our recent cases, beginning with *Robinson,* we have rejected the notion that a public defender's office is to be treated as a law firm or an "entity" in considering a conflict of interest claim; the disqualification of one assistant public defender due to a conflict of interest will not necessarily disqualify all members of the public defender's office. (*People v. Robinson* (1979), 79 Ill. 2d 147, 158-59.) Thus, in a given situation, where one assistant may not effectively represent two competing interests, two assistants might be able to do so, and in determining whether separate assistants can properly represent competing interests, we are to apply the general guidelines enunciated in our prior cases and those of the United States Supreme Court on the subject of conflicts of interest. (*People v. Robinson* (1979), 79 Ill. 2d 147, 159-60, citing *Glasser v. United States* (1942), 315 U.S. 60, 86 L. Ed. 680, 62 S. Ct. 457; *Holloway v. Arkansas* (1978), 435 U.S. 475, 55 L. Ed. 2d 426, 98 S. Ct. 1173; *People v. Stoval* (1968), 40 Ill. 2d 109; *People v. Kester* (1977), 66 Ill. 2d 162; *People v. Berland* (1978), 74 Ill. 2d

286; *People v. Vriner* (1978), 74 Ill. 2d 329.) Rather than applying a *per se* rule, thereby disqualifying an entire public defender's office whenever one of its members is confronted with a conflict, a case-by-case inquiry is contemplated whereby it is determined whether any facts peculiar to the case preclude the representation of competing interests by separate members of the public defender's office. See, *e.g., People v. Smith* (1967), 37 Ill. 2d 622.

In reviewing the present case in light of the above-mentioned principles, we do not find that defendant was denied effective assistance of counsel. Our conclusion is dictated by our analysis of the attorneys' respective obligations and the interests they were called upon to represent. Defendant's attorney and the attorney assigned to the defense witness, Myles, had clearly independent responsibilities; it was the duty of defendant's attorney to represent defendant and the responsibility of Myles' attorney to advise him of the implications of confessing in court. As the circuit court noted, the role of Myles' attorney was limited and did not conflict with that of defense counsel. As we indicated earlier, the circuit court told Myles' attorney "that you as an attorney know what his rights are and that you can properly advise him as to his rights ***." Myles' attorney needed only to advise Myles that any statements could be used against him if he chose to testify.

It is also significant to note that any attorney, whether from the public defender's office or not, understandably would have advised Myles to invoke the privilege against self-incrimination. On this point, we find *Robinson* to be controlling. In that case, defendant Nick Freeman and a codefendant were represented by assistant public defenders, and Freeman alleged that improper *voir dire* examination by the codefendant's attorney prejudiced prospective jurors against Freeman. We rejected the argu-

ment, holding that the questions asked by the codefendant's attorney did not stem from the fact that both Freeman and the codefendant were represented by assistant public defenders "and may as well have been asked by counsel with no prior association." (*People v. Robinson* (1979), 79 Ill. 2d 147, 172.) Similarly, we consider it to be important here that any attorney may well have advised Myles as did the assistant public defender assigned to him.

We also find no indication that defendant's attorney tempered his representation of defendant's interests. (*People v. Spicer* (1979), 79 Ill. 2d 173, 186-87.) In fact, defense counsel insisted on calling Alfred Myles to the stand even after Myles told the court that he would not testify. By forcing Myles to invoke the privilege against self-incrimination in court, the jury could infer that Myles, rather than defendant, committed the robbery. Such vigorous representation by defense counsel belies a claim of ineffective assistance. (*People v. Walton* (1979), 78 Ill. 2d 197, 202-03.) Finally, defense counsel's examination of Myles could hardly be labeled "cautious," as in the cases cited by defendant. (See, *e.g., Austin v. Erickson* (8th Cir. 1973), 477 F.2d 620, 623-24.) After being ordered to the stand, Myles was asked point-blank questions relating to his whereabouts on the night of the robbery, his participation therein, and his familiarity with defendant. The fact that Myles refused to answer has no bearing on the effectiveness of defense counsel.

Though we acknowledge the principle that prejudice to the defendant is presumed where it is shown that his attorney faces a conflict of interest in representing him (*Glasser v. United States* (1942), 315 U.S. 60, 75-76, 86 L. Ed. 680, 702, 62 S. Ct. 457, 467; *People v. Stoval* (1968), 40 Ill. 2d 109, 113), we find no conflict in the situation here present, and on the question of prejudice, we deem it appropriate to note that the defense witness' invocation of the privilege against self-incrimination may

well have benefited defendant by creating the implication that the witness rather than defendant committed the robbery. Indeed, defendant's counsel asked the jury in closing argument to infer that this was so.

Defendant cites cases from other jurisdictions in support of his argument that he was denied effective assistance of counsel, but we do not find them to be in point. *Austin v. Erickson* (8th Cir. 1973), 477 F.2d 620, and *State v. Belcher* (1970), 106 Ariz. 170, 472 P.2d 39, involved representation of codefendants by only one member of a public defender's office rather than two, as is the case here. *Commonwealth v. Westbrook* (1979), 484 Pa. 534, 400 A.2d 160, was based on the premise that a public defender's office is to be treated as a law firm in addressing conflict of interest claims, a premise we expressly refused to accept in *Robinson.*

The second argument advanced by defendant on appeal is that the circuit court erred in denying his motion for a new trial after hearing Alfred Myles' testimony that he, rather than defendant, participated in the robbery. We find no ground for reversal in the argument. The circuit court did not abuse its discretion in denying the motion.

A succinct and oft-cited summary of criteria to be considered in reviewing the circuit court's denial of a motion for a new trial is found in *People v. Baker* (1959), 16 Ill. 2d 364. The court there said: "A motion for a new trial on the ground of newly discovered evidence is addressed to the discretion of the trial judge and denial thereof will not be disturbed upon review in the absence of a showing of an abuse of discretion. [Citation.] To warrant a new trial, the new evidence must be of such conclusive character that it will probably change the result on retrial, that it must be material to the issue but not merely cumulative, and that it must have been discovered since the trial and be of such character that it could not have been discovered prior to trial by the exercise of due diligence. [Citations.] "

(16 Ill. 2d 364, 373-74.) In an earlier case, the court also held: "Applications for a new trial on the ground of newly discovered evidence are not looked upon with favor by the courts, and in order to prevent, so far as possible, fraud and imposition which defeated parties may be tempted to practice, as a last resort, to escape the consequence of an adverse verdict, such application should always be subjected to the closest scrutiny by the court, and the burden is upon the applicant to rebut the presumption that the verdict is correct and to show there has been no lack of diligence. The matter is largely discretionary with the trial court, and the exercise of its discretion will not be disturbed except in case of manifest abuse." (*People v. Holtzman* (1953), 1 Ill. 2d 562, 569; see also *People v. Reese* (1973), 54 Ill. 2d 51, 59; *People ex rel. Walker v. Pate* (1973), 53 Ill. 2d 485, 491-94.) Judged by these standards, there was no abuse of discretion. The circuit court could reasonably conclude that Alfred Myles' testimony was merely cumulative and that it would not have changed the result. Defendant produced four witnesses—himself, Eddie Myles, Barbara Meyers and Ray Horton—who testified that defendant was not involved in the robbery; two of these four witnesses—Eddie Myles and Barbara Meyers—also implicated Alfred Myles in their testimony. Alfred Myles' testimony would not have added anything new on either point. Alfred Myles' testimony, as well as that of the defense witnesses, was also severely contradicted by the testimony of the victim and that of an eyewitness, and his testimony even conflicted with that of the defense witnesses. The defense evidence was that Alfred Myles had wielded the gun during the robbery, but Myles denied any knowledge of a gun being used. Finally, the trial judge in this case had also presided at defendant's original trial, and he listened as the prosecutor, on cross-examination of the defense witnesses, read their contradictory prior testimony into the record. He saw and heard the witnesses as

they changed their testimony from trial to trial, he observed Alfred Myles alternatively refuse and then agree to testify, and he could well conclude that a new trial would serve no useful purpose.

Defendant's final argument is that the State failed to prove guilt beyond a reasonable doubt. We find no merit to the argument. The State's evidence was positive, consisting of the accounts of both the victim and an eyewitness, as well as the corroborating testimony of the arresting officer and corroborating physical evidence. Conflicting defense testimony, repeatedly impeached, raised only questions of fact and credibility, questions which are properly left to be resolved by the jury.

The judgment of the appellate court is accordingly reversed, and the judgment of the circuit court is affirmed.

*Appellate court reversed;*
*circuit court affirmed.*